UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CENTURYLINK, INC.,                           :
                                             :
                    Plaintiff,               :
                                             :       OPINION & ORDER
        -against-                            :
                                             :       11 Civ. 5528 (HB)
DISH NETWORK, L.L.C.,                        :
                                             :
                    Defendant.               :
-------------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge:**

  Plaintiff CenturyLink, Inc., ("CenturyLink") moves pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings as to the liability of defendant DISH Network, L.L.C., ("DISH") under the contract between them and based on the denials in the DISH answer. For the reasons set forth below, the present motion is GRANTED.

## Background

  CenturyLink provides telephone and internet services and DISH satellite TV service. The parties entered into a contract that was to run from April 2007 until August 2010 (the "Contract") and allowed CenturyLink to sell DISH's TV service along with CenturyLink's phone and internet service in what is referred to as a bundled service or package.[1] An important component of the Contract is the means by which CenturyLink and DISH continue to provide uninterrupted service to existing customers after the providers' contractual relationship formally ends. Such existing customers are referred to as "legacy customers" and this period of time as the "wind-down period." *See* Contract § 1, 12.4(b). CenturyLink properly terminated the Contract in 2010, without renewing, and the only issue before the Court is whether certain monthly incentive payments are owed to CenturyLink during the wind-down period.

## Discussion

  A motion for judgment on the pleadings enables the moving party to have the court rule in its favor based on the merits of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). The court applies the same standard in a Rule 12(c) motion as it does in

---

[1] The Contract itself refers to predecessor companies "EMBARQ" (CenturyLink) and "EchoStar" (DISH). For the sake of clarity, all references to these predecessor companies have been replaced.

a Rule 12(b)(6) motion, and the court must accept as true the allegations contained in the pleading and draw all reasonable inferences in favor of the non-moving party. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). "A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law." *Citibank, N.A. v. Morgan Stanley & Co. Int'l., PLC*, 724 F. Supp. 2d 407, 414 (S.D.N.Y. 2010).

DISH questions the propriety of a Rule 12(c) motion and argues that its denials in the answer are sufficient to create issues of material fact. *See* Def.'s Opp'n 9–11 (citing *Virgin Group Holdings v. Energy Parametrics & Comm'ns*, No. 10 CV 08752(BSJ)(THK), 2011 WL 4448943 (S.D.N.Y. Sept. 26, 2011)). In order to prevail on its contract claim, CenturyLink must prove (1) the existence of an agreement, (2) adequate performance of the contract by CenturyLink, (3) breach of contract by DISH, and (4) damages. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). CenturyLink does not presently seek a determination as to damages, and there is no dispute that a contract existed and was adequately performed by CenturyLink. The interpretation of the Contract here raises an issue that is capable of resolution as a matter of law, and DISH's conclusory denial of a breach is insufficient to create a material issue of fact. *See Kondaur Capital Corp. v. Cajuste*, 82 Fed. R. Serv. 3d 195 (E.D.N.Y. 2012) ("The Court is not bound to accept as true legal conclusions couched as factual allegations. Bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations and will not defeat the motion." (internal citations and quotation marks omitted)); *cf. Virgin Group Holdings*, 2011 WL 4448943, at *1 ("Plaintiff alleges in its complaint that it was indeed ready, willing, and able to [perform]. In their Answer, Defendants respond that they lack sufficient information to either admit or deny Plaintiff's contention." (internal citation omitted)).

I. **Contract Interpretation under New York Law**

The parties agree and the Contract requires that New York law governs. "Under New York law, '[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.' Typically, the best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'" *Eternity Global Master Fund Ltd.*, 375 F.3d at 177 (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002)). "Contract

language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993) (internal quotation marks omitted).

## II. CenturyLink's Textual Interpretation

CenturyLink provides a reasonable interpretation of the Contract. In short, the monthly incentive ("MI") and wind-down provisions anticipate the continued payment of the MI for as long as there are a sufficient number of legacy customers. The Contract requires CenturyLink and DISH to "each continue to provide services" to legacy customers, who are those subscribers "existing at the date of [the Contract's expiration.]" Contract § 12.4(b). Should CenturyLink cease to actively market and promote the bundled services during the term (that is, before the expiration of the Contract), DISH may proactively terminate the agreement and thereby cutoff MI payments that would otherwise have continued beyond the term.

### a. Incentive Payments in the Regular Course

Section 9.1 reads: "Activation Incentives and Monthly Incentives are payable by [DISH] to [CenturyLink] as provided in Schedules 9.1 and 9.8.1 for sales to Qualified Subscribers . . . ." Section 1 defines "activation incentive" as a "one-time payment for the sale and subsequent activation by [CenturyLink] of a Qualified Subscriber . . . as further described in Schedule 9.1" and MI as "a monthly recurring payment for each month that a Qualified Subscriber acquired by [CenturyLink] remains a Qualified Subscriber as further described in Schedules 9.1 and 9.8.1." These provisions work together to provide for two forms of remuneration to CenturyLink for its obligation to market and promote the bundled packages. The MI, as distinct from the one-time activation incentive, is a *recurring* payment for *each month* that an acquired customer *remains* a Qualified Subscriber. CenturyLink is paid immediately upon the acquisition of a new customer (activation incentive) and each month thereafter for as long as the customer subscribes to the bundled services (MI). Schedule 9.1 sets the dollar amounts:

1. **Activation Incentive:** For each activation of a new Qualified Subscriber . . . by [CenturyLink], [DISH] will pay a one-time Activation Incentive of $200 . . . .
2. **Monthly Incentive:** For each month that a new Qualified Subscriber acquired by [CenturyLink] remains a Qualified Subscriber . . . , [DISH] will pay [CenturyLink] a Monthly Incentive of $1.75 per such Qualified Subscriber . . . .

3

Schedule 9.8.1, titled "Payment Standards", governs the manner in which the incentives are to be paid (such as when and how they are effected). Much of this text is irrelevant to the issue before the Court. While critical to DISH's textual argument, Schedule 9.8.1 under CenturyLink's view simply reinforces what has already been stated. The Schedule states that:

> Provided [CenturyLink] has reached the Monthly Incentive activation minimum, (1 activation) payment of Monthly Incentives to [CenturyLink] will commence when and for such times as Monthly Incentives payable to [CenturyLink] exceed twenty-five dollars ($25.00).

Read in context, this Schedule merely provides the mechanism by which MI payments start and the threshold amount. Once one account has been activated, MI payments "commence when" there are a sufficient number of customers such that the total value of the MI (at a rate of $1.75 per customer) exceeds the threshold amount of $25. The MI is paid for an indeterminate period time ("for such times"), subject to the limitation that the MI is not paid when the total value falls below the threshold. This is consistent with the definition of MI in § 1 (payments are "recurring" every month for each customer) and Schedule 9.1 (requiring that $1.75 be paid for each month that a customer continues to subscribe).

With the emphasis that these provisions place on the recurring nature of the MI payments, the provisions defining what it means to remain a Qualified Subscriber come as no surprise. The MI is not paid for any account when the programming has been cancelled, payment by the customer was not received, or the bundled service is otherwise deactivated. Contract § 9.4; *see also id.* Schedule 9.8.1 ("[MI] will discontinue on any Qualified Subscriber if such account has terminated any agreement with [DISH], disconnected or downgraded for any reason."). These provisions ending the MI do not mention termination of the Contract.

    b.  *The Wind-Down (Post-Termination) Period*

The Contract anticipates its natural expiration, with or without an optional renewal by the parties, and at the same time provides for continued service to legacy customers. *See id.* § 1 (defining the wind-down period). The import of such a contingency is obvious; the companies' brands would suffer if a content subscriber suddenly lost a valued service (not to mention the value of the existing accounts to DISH and CenturyLink). The various ways in which the Contract may be terminated are governed by § 12; the post-termination obligations by § 12.4.

The applicable provision here is § 12.4(b), which applies when the termination is by the expiration of the term of the Contract.[2]

In the wind-down period, the parties continue to provide services to legacy customers, continue to perform their respective obligations,[3] and "continue to provide payment to each other under the same terms as provided for under [the Contract] . . . ." *Id.* § 12.4(b)(i)–(iii). The post-termination obligations in § 12.4(b) are subject to the limitations provided for in other subsections of § 12.4, such as § 12.4(a), which requires CenturyLink to immediately stop selling and marketing the bundled service. The wind-down period ends when the parties agree that "the number of Legacy Customers has declined to a level where it is not commercially reasonable to continue to serve them." *Id.* § 12.4(b).

    c. *Termination by DISH*

If termination of the Contract is not by the expiration of the term, then § 12.4(b) (the wind-down period) is no longer the operative provision for post-termination obligations. For example, § 12.2(g)(ii) allows for DISH to unilaterally terminate the agreement if CenturyLink "ceases to continuously and actively market and promote [bundled services] . . . ." The post-termination obligations are then found in § 12.4(c) ("If the termination is pursuant to Section 12.2 . . . ."), which allows for DISH to elect whether to split the bundled service or apply the wind-down provisions. Section 12.4(e) also provides for further relief in the event of a breach.

While § 12.2 provides multiple grounds for DISH to unilaterally terminate the agreement, § 12.2(g)(ii) (if CenturyLink "ceases to continuously and actively market and promote [bundled services] . . . ." ) is especially relevant in this case. As was mentioned above, § 9.1 gives CenturyLink the right to MI payments. The same circumstances that trigger § 12.2(g)(ii) also trigger § 9.6, the "Special Provisions Related to Monthly Incentives." Section 9.6, in part, provides that: "In the event that [CenturyLink] ceases to offer and sell [bundled services], payment of all [MIs] will continue through the Term of the Agreement." CenturyLink is penalized for the breach; the MI payments do not last for the life of the customer but are instead cut short. This is the case even if DISH elects pursuant to § 12.4(c) for the wind-down provisions

---

[2] Section 12.4(b) is applicable if the termination is pursuant to § 7, which defines the "Term": "The term of this Agreement continues . . . on the Effective Date and expires on a date that is three (3) years after the Effective Date unless terminated earlier . . . . The Term of this Agreement will be automatically renewed . . . unless either party gives notice . . . ."

[3] These obligations include such things as billing and customer service. *See id.* § 5.

to apply, which require the parties to "continue to provide payment to each other under the same terms as provided for under this Agreement . . . ." *Id.* § 12.4(b)(iii). The Special Provision, § 9.6, remains in effect, and CenturyLink is denied the MI to which it would otherwise be entitled.

### III. DISH's Textual Interpretation

DISH provides a simple and straightforward interpretation of the Contract. Unfortunately, it is also an unreasonable one. Under DISH's view, § 9.6 provides for payment of the MI only through the term of the Contract, even without a breach by CenturyLink. Section 9.8 and Schedule 9.8.1 can be interpreted to confirm this reading. Therefore, rather than constituting a penalty that cuts MI payments short in the event of a breach by CenturyLink, § 9.6 actually confers a benefit on CenturyLink by extending MI payments through the term when, under prior agreements, MI payments would have stopped at the moment CenturyLink ceased to offer and sell promotions.

*a. DISH's Interpretation of Section 9.6*

Recall the text of § 9.6: "In the event that [CenturyLink] ceases to offer and sell [bundled services], payment of all [MIs] will continue through the Term of the Agreement." According to DISH, this means that MI payments are not made in the wind-down period because CenturyLink no longer offers and sells the bundled services after the expiration of the Contract; CenturyLink ceased marketing activities. Section 9.8.1 says simply that "[DISH] will pay Incentives to [CenturyLink] in accordance with [DISH]'s payment standards, which are set forth in Schedule 9.8.1." Schedule 9.8.1, in part, states that:

> Provided [CenturyLink] has reached the Monthly Incentive activation minimum, (1 activation) payment of Monthly Incentives to [CenturyLink] will commence when and for such times as Monthly Incentives payable to [CenturyLink] exceed twenty-five dollars ($25.00).

According to DISH, this provision:

> establishes that MI will only be paid after the termination of the Agreement in limited circumstances. Such payments are only made if, at a minimum, one activation [the installation and activation of services after a sale] occurs in a given month following the termination of the Agreement and there is a sufficient number of activations in that month so that the total MI due exceeds $25.00.

Def.'s Opp'n 13. DISH explains that while CenturyLink is prohibited from selling services after termination, there may still be customers who were properly sold services but whose accounts have yet to be activated (referred to as "pipeline" customers). If there were a sufficient number

of pre-termination sales followed by post-termination activations, then CenturyLink would be entitled to the incentive. Finally, DISH argues that § 12.4(b), which covers post-termination obligations when the termination is due to the expiration of the Contract, contemplates that MI payments will cease at termination. Def.'s Opp'n 14–15. Section 12.4(b)(iii) reads: "the Parties shall continue to provide payment to each other under the same terms as provided for under this Agreement[.]"

> b. *DISH's Interpretation Distorts the Contract's Language and Frustrates Its Structure*

DISH treats § 9.6 as a definitional provision that assumes the MI is understood to stop at termination. DISH does not reference the actual definition of MI and twists the words contained in nearly every provision it does cite to ignore the temporal implications of the language. The one exception to this, of course, is that § 9.6 does say MI "will continue through the Term . . . ." But even there, DISH's interpretation requires the reader to forgive the reasonable inference that § 9.6 is relevant only when the parties are *still in the term*. DISH's reading is also irreconcilable with § 1, which defines MI as "a monthly recurring payment for each month that a Qualified Subscriber acquired by [CenturyLink] remains a Qualified Subscriber . . . ." DISH does not argue that legacy customers no longer remain subscribers.

The Contract has an understandable structure. It addresses termination in § 12 and anticipates post-termination obligations in § 12.4. The MI is defined in § 1, vested in §§ 9.1 and 9.8.1, and detailed in Schedules 9.1 and 9.8.1. DISH asks the Court to set aside this natural structure and ignore the restrictive words of the very section on which its argument depends. Section 9.6 is a *special* provision. It is relevant *in the event* that CenturyLink *ceases* to market the product. What is special about a term that is always applicable and does not depend on CenturyLink's actions? CenturyLink does not simply *cease* to market products post-termination, CenturyLink is expressly prohibited from doing so. *See id.* § 12.4(a) ("If this Agreement terminates for any reason, then: (a) [CenturyLink] shall immediately discontinue the marketing and sales of, and the solicitation of, orders for the Bundled Services . . . ."). If, in the wind-down period, CenturyLink is deemed to "cease" offering and selling services for the purpose of § 9.6 (cutting off MI payments beyond the term), then why hasn't CenturyLink also "ceased" offering and selling services for the purpose of § 12.2(g)(ii) (constituting a breach by CenturyLink and giving DISH the right to prematurely end the wind-down period)?

DISH also stretches the language of Schedule 9.8.1 to an untenable degree. DISH argues that "Provided [CenturyLink] has reached the [MI] activation minimum" means that MI "payments are only made if, at a minimum, one activation occurs *in a given month*" and that MI payments "will commence when and for such times as [the MI exceeds $25.00]" means "payments are only made if . . . there is a sufficient number of *activations in that month* . . . ." *Compare* Contract Schedule 9.8.1, *with* Def.'s Opp'n 13 (emphasis added). DISH ignores that the MI is consistently referred to as a recurring payment and ignores that there are already incentive provisions that deal directly with the activations themselves. *See, e.g.*, Contract Schedule 9.1 (setting amounts for the activation incentives for "new" customers and the monthly incentives for "each month" that those newly acquired customers "remain[]" subscribers).

Perhaps most troublesome is that DISH's own interpretation appears to me to be internally inconsistent. DISH offers an interpretation that begins from the perspective of a termination by the expiration of the term. This interpretation, when viewed from the perspective of a breach by CenturyLink during the term, creates tension between § 9.6 and Schedule 9.8.1. Accepting for the sake of argument DISH's interpretation, in the event that CenturyLink ceases to offer and sell promotions during the term, Schedule 9.8.1 would seemingly continue to provide a limitation on the payment of the MI to only those remaining pipeline customers (those who have purchased services but whose accounts are not yet activated). *See* Def.'s Opp'n 13. Yet § 9.6 would require that MI payments be made through the term. I cannot comprehend how MI payments can be made through the term when there are no remaining sales and subsequent activations during the term other than pipeline customers. Because of Schedule 9.8.1, there will be no subsequent MI payments apart from pipeline customers regardless of whether the Contract terminates by expiration of the term or by CenturyLink's breach during the term.

Both parties invite the Court to speculate on the economic costs and benefits derived from legacy customers. *See* Pl.'s Supp. 4, 8; Def.'s Opp'n 18 n.19. Each must continue providing services and refrain from certain marketing activities. DISH does not contest its obligation to continue compensating CenturyLink for billing and collection responsibilities, which are required "for each Bundled Subscriber per month", much like the MI payments. Contract § 1.6. DISH would likely argue that this compensation is distinguishable from the MI because CenturyLink's billing and collection responsibilities are ongoing through the wind-down period. The MI is an *incentive*, however, and is compensation for past services rendered (the marketing

8

and selling of bundled services) and for customer retention (to preserve the continued payments). It is not for the Court to opine on the value of these services and to speculate on whether a more appropriate MI is one that ends with the term. Neither view of the economic value of the wind-down period is farfetched. It is simply enough for the Contract to state unambiguously that the MI payments continue each month for the life of the customer.

    *c.  The Sprint Contract*

DISH reaches for a prior agreement, the Sprint Contract, incorporated by reference in the preamble of the Contract, as a further basis on which to find its interpretation reasonable. The Contract at issue here was based on this earlier agreement. Carefully circumventing the Contract's integration clause,[4] DISH says the Sprint Contract puts this one in context and can be used to understand the meaning of § 9.6.

I have laid the agreements side-by-side. In nearly all relevant respects, they are identical. The schedules are slightly different in that under Schedule 9.1 of the Sprint Contract, DISH pays an MI that is determined by the number of legacy customers ($1.00 for up to 25,000 subscribers, $1.50 for up to 100,000, and $1.75 for any amount greater than 100,000). The Contract here breaks this into two Schedules, paying $1.75 for all legacy customers, but only when the total MI amount exceeds $25.00, starting after the first activation. *See* Contract Schedules 9.1, 9.8.1.

Section 9.6 is the exception. The Sprint Contract reads:

> **9.6 Rolling Adjustment to Payment of Activation Incentives and [Monthly] Incentives** . . . In the event that Sprint ceases to offer and sell [bundled services], payment of all [MIs] will cease.

When viewed from the larger context of the entire agreement, the Sprint Contract is subject to the same interpretation as the Contract here. *See S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005) ("It is also important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases."). The difference is that in the event of a breach by Sprint, the MI payments stop immediately, whereas CenturyLink is paid through the term. The Sprint Contract gives me further confidence that CenturyLink's interpretation of the Contract is the only reasonable one.

---

[4] Section 16.15 states that the Contract "constitutes the entire agreement and understanding between the parties" and "supersedes all prior or contemporaneous negotiations or agreements . . . ."

9

IV.   **Extrinsic Evidence: Surrounding Circumstances and Parol Evidence**

DISH argues that CenturyLink's interpretation requires that the Court navigate "a maze of contractual provisions", and that "[it] strains credulity that it would be possible for this Court to fully understand and interpret the interrelationship between and among 29 definitional Sections, substantive Sections and Schedules of the 95-page, single-spaced, reticulated sales agency agreement, without the benefit of testimony . . . ." Def.'s Opp'n 17–18. After working my way through the parties' respective interpretations, DISH has indeed persuaded me that I can understand its interpretation only with the benefit of testimony, which is supportive of my view that it is in fact unreasonable. On the other hand, I managed to emerge unscathed from CenturyLink's supposed labyrinth.

a.   *Extrinsic Evidence Can be Considered to Determine Whether an Ambiguity Exists*

DISH is correct that the Court may consider extrinsic evidence when resolving this motion, but DISH goes too far. The Second Circuit carefully circumscribed the proper use of similar extrinsic evidence as follows:

> [T]he question of whether an ambiguity exists is assessed from the viewpoint of a reasonably intelligent person who has examined the context of the entire integrated agreement and *who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business*. Of course, the line between a contract that is so clear as a matter of ordinary meaning that evidence of industry practice ultimately cannot alter the apparent plain meaning of the language and a contract where industry practice informs interpretation may prove difficult to draw. But that is not to say that evidence of custom and usage is irrelevant to the assessment of whether ambiguity exists.

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 n.4 (2d Cir. 2002) (internal quotation marks and citations omitted). The proffered evidence, in order to demonstrate that an ambiguity exists, must concern objective understandings, such as common usage in the industry or trade terms. *Cf. United States v. Lennox Metal Mfg. Co.*, 225 F.2d 302, 311 (2d Cir. 1955) (dictum) ("[I]t is regarded by many authorities as a fallacy that, in interpreting contractual language, a court may not consider the surrounding circumstances unless the language is patently ambiguous. Any such rule, like all rules of interpretation, must be taken as a guide, not a dictator. The text should always be read in its context. Indeed, text and context necessarily merge to some

10

extent . . . ."); *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).[5] Therefore, the Court cannot rely on parol evidence to interpret the Contract unless it is ambiguous, but the Court can look to the surrounding circumstances to determine whether ambiguity exists in the first place. *See R/S Associates v. New York Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002) ("Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." (internal quotation marks omitted)); *Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995) ("The rules governing the construction of ambiguous contracts are not triggered unless the court first finds an ambiguity.").

  b. *The Section 9.6 Compromise*

  Critical to the success of DISH's position is consideration of the extrinsic evidence that suggests DISH understood the Contract to mean MI payments would never continue past the term, and that CenturyLink knew this was DISH's understanding. DISH places considerable emphasis on the negotiations over the language of § 9.6. The Court has no reason to disbelieve DISH when it says that § 9.6 was a particularly contentious topic, especially when the difference from the Sprint agreement is apparent. According to DISH, the current language reflects a "compromise" that required DISH to pay the MI through the entire term "even if [CenturyLink] ceased selling [the bundled services] during the term." Def.'s Opp'n 12. DISH quotes language proposed by CenturyLink to modify § 9.6 from the original Sprint provision to read:

> In the event that [CenturyLink] ceases to offer and sell Qualified Promotions, payment of all [Monthly] Incentives will continue for as long as [CenturyLink] continues to provide the existing and current combined billing and customer service for said customer. Payment of all [Monthly] Incentives for new DISH customers acquired through [CenturyLink] will continue as long as the corresponding Qualified Subscriber remains an active DISH customer.

Def.'s Opp'n 5 n.6.

---

[5] *Atwater & Co. v. Pan. R. Co.*, 159 N.E. 418 (N.Y. 1927), cited by DISH, does not counsel a different result. The Court of Appeals in *Atwater* stated that:

> The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.

DISH conveniently leaves off the second sentence. *Atwater* does not stand for the proposition that parol evidence can be appropriately considered to interpret an unambiguous contract.

There is no indication that extrinsic evidence "informs the interpretation" of the apparent plain meaning of the language. *Int'l Multifoods Corp.*, 309 F.3d at 87 n.4. The evidence does not demonstrate that there is an ambiguity, rather, at best it demonstrates that the parties' subjective state of mind may have differed from what is the clear meaning of the language in the executed Contract. Such evidence does not create a question of fact, and the Contract remains unambiguous. *See W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."); *Dryden Cent. Sch. Dist. v. Dryden Aquatic Racing Team*, 600 N.Y.S.2d 388, 391 (N.Y. App. Div. 1993). This evidence is simply part of what the trier of fact would look to *were the Contract ambiguous*. *See Morgan Stanley*, 225 F.3d at 275–76 ("Once a court concludes that [a contract] is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." (internal quotation marks omitted)); *S. Rd. Assocs.*, 826 N.E.2d at 809–10 (holding that the conduct of the parties was "not sufficient to create an ambiguity in the lease where the language is clear").

Nor is this a case where the "agreement seems clear on its face" but contains a "'latent ambiguity' . . . by reason of 'the ambiguous or obscure state of extrinsic circumstances to which the words of the instrument refer' . . . ." *Teig v. Suffolk Oral Surgery Associates*, 769 N.Y.S.2d 599, 600 (N.Y. App. Div. 2003) (quoting *Lerner v. Lerner*, 508 N.Y.S.2d 191, 194 (N.Y. App. Div. 1986)). Given that the Contract specifically provides for a wind-down period in § 12 that anticipates the expiration of the term, *see* § 7, as distinct from a termination due to CenturyLink's breach, *see* § 12.2, it would be an untenable position to argue that the parties "never contemplated the instant situation." *Lerner*, 508 N.Y.S.2d at 194.

In sum, the evidence offered by DISH is parol evidence and does not provide a reason for why this motion cannot or should not be resolved by reference solely to the language of the Contract. *See Greenfield*, 780 N.E.2d at 170–71 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide. . . . Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."); *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001) ("[C]ourts may not by construction

add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (internal quotation marks omitted)).

## Conclusion

For the foregoing reasons, CenturyLink's motion for partial judgment on the pleadings is GRANTED. Under the terms of the Contract, DISH is to pay monthly incentives for legacy customers from termination through the wind-down period as provided in § 12.4(b). The Clerk of Court is instructed to close the motion.

**SO ORDERED.**

Date: July 31, 2012
New York, New York

HAROLD BAER, JR.
**United States District Judge**